Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Friday, February 08, 2008 9:41:31 AM

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: ) | |
| ) | |
| TACKLEY MILL, LLC ) | CASE NO. 06-820 |
| ) | |
| Debtor. ) | |

## MEMORANDUM OPINION

The Official Committee of Unsecured Creditors for Tackley Mill, LLC (the "Committee"), requests entry of three orders. First, the Committee asks that the court approve its final fee application. Second, it seeks authorization to distribute $400,000 to pay: (a) the administrative claims of the Committee's professionals, (b) $25,000 to General Capital Partners, LLC, and (c) unsecured claims, pro rata, as defined by the Committee. Third, after entry of the above two orders, it asks that the case be dismissed.

Beazer Homes, Corp. ("Beazer"), and C. William Hetzer, Inc. ("Hetzer"), object to the Committee's fee application on the basis that the Committee's counsel billed too many hours for retention related issues, and the hourly rates requested for the Committee's professionals exceeds local standards. Thompson, Greenspan & Co., P.C. ("TG&C"), accountants to the estate, object to the Committee's professionals being paid when they are not. Beazer, Hetzer, and Jefferson Orchards, Inc. ("Jefferson Orchards"), object to the Committee's motion to distribute the $400,000 on the basis that the Committee has refused to include their claims in its proposed distribution to unsecured creditors. Once the above two objections are resolved, no party contests the dismissal of the Debtor's case.

The court held a telephonic hearing on these issues on January 14, 2008, at which time the court took all matters under advisement. For the reasons stated herein, the court will overrule the objections to

1

the Committee's fee application, and will order that the unsecured claims of Beazer, Hetzer, and Jefferson Orchards be included in the proposed distribution to unsecured creditors.

## I. BACKGROUND

Before filing its September 13, 2006 Chapter 11 bankruptcy petition, Tackley Mill, LLC (the "Debtor"), had purchased two tracts of land in Jefferson County, West Virginia on which it proposed to build a housing development. One tract was 232 acres, and the other was 68 acres. S.F.C., LLC ("SFC") has a October 18, 2005 deed of trust on both properties securing a loan in the principal amount of $23,500,000. A related entity, S.F.C. II, LLC ("SFC II"), also has a October 18, 2005 deed of trust on both properties securing a loan in the principal amount of $4,200,000, and a corrected deed of trust dated April 19, 2006. Beazer, Hetzer, and Jefferson Orchards also claim various deeds of trust on the properties, all of which are junior to the lien of SFC, but some of which are purported to be senior to the deed of trust held by SFC II.

Pre-petition, the Debtor failed to meet the terms of its loan obligations to SFC and SFC II. Accordingly, SFC II noticed a foreclosure sale of both properties for July 26, 2006. SFC II was the only bidder at the foreclosure sale, and it purchased both tracts of land, subject to the existing deed of trust in favor of SFC, for $3.00. The Debtor filed its Chapter 11 bankruptcy petition after the foreclosure sale, but before foreclosure sale deed was recorded.

In the bankruptcy proceeding, the Debtor filed an adversary complaint to set-aside the foreclosure sale conducted by SFC II on the basis that: (1) the transfer of the property was avoidable by the debtor pursuant to 11 U.S.C. § 544(a)(3); (2) the foreclosure sale price was grossly inadequate, and (3) the automatic stay prevented the recordation of the foreclosure sale deed. In turn, SFC filed a motion for relief from the automatic stay to allow the recordation of the foreclosure sale deed. The court consolidated the motion with the adversary proceeding.

Before the adversary complaint could be tried, the Committee elected to hire counsel, Ardent Fox, LLP ("Ardent Fox"), located in Washington, D.C. In its employment application, Ardent Fox represented that it would bill a partner's time at hourly rates ranging from $395 to $760, associate's time from $240 to $490, and paraprofessional time from $140 to $235. The Debtor objected to the application to employ Ardent Fox as counsel to the Committee on the grounds that the hourly rates being charged were excessive

2

based on prevailing rates in the Northern District of West Virginia.[1]  As an accommodation to the Debtor, Ardent Fox, agreed not to bill partners at more than $490 per hour, and agreed to reduce the compensation paid to an associate working on the case by 10% to $320 per hour.  At the April 10, 2007 hearing on Ardent Fox's application for employment, the court stated that the requested fee range – even as reduced – was high in relation to prevailing hourly rates in the Northern District of West Virginia, but the court also noted that the attorneys working on the case were highly experienced in bankruptcy matters.  The court indicated that it would scrutinize any fee application submitted by Committee counsel in due course, but counsel's hourly rates were not a basis by which the court would deny Ardent Fox's application for employment.

Once Ardent Fox was employed, the parties renewed their settlement negotiations concerning both the adversary proceeding and SFC's lift stay motion.  The negotiations resulted in a June 28, 2007 motion to compromise, which was approved by the court on July 23, 2007 (the "Settlement Agreement").  In essence, the Settlement Agreement gave the Debtor a limited amount of time to refinance the properties and payoff an agreed amount to SFC and SFC II.  When the anticipated refinancing did not timely occur, SFC and SFC II obtained relief from the automatic stay, and SFC II recorded the deed of trust from the July 26, 2006 foreclosure sale.

In negotiating the Settlement Agreement, the Committee obtained an important concession from SFC:

> 4.     **Allocation of Collateral**.  If the Lift Stay Event occurs . . . SFC agrees to allocate . . . $400,000 of the Collateral, in cash, to satisfy, among other things, the claims of unsecured creditors and the fees of the Committee's professionals (the **"Unsecured Creditor Allocation"**), with such allocation to be made after SFC successfully receives title to the Collateral.

(Doc. No. 181).

At the time the Committee negotiated the terms of Paragraph 4, the total amount of unsecured

---

[1] By comparison, local counsel to the Committee, Phillips, Gardill, Kaiser & Altmeyer, PLLC, disclosed their hourly rates for partners as $175 to $240, associates as $90 to $130, and paraprofessionals as $60 to $90.

3

claims filed against the Debtor's estate was about $645,905. In addition to this amount, Beazer had filed an unsecured claim relating to a breach of contract action against the Debtor in which it claimed to be owed $20,834,876. At the July 20, 2007 hearing on the motion to compromise, the Committee's counsel stated that the Unsecured Creditor Allocation was negotiated on the premise that the total amount of unsecured claims against the Debtor's bankruptcy estate was somewhere in the $900,000 range.

## II. DISCUSSION

Two objections are before the court for adjudication: (A) whether the court should approve the final fee application of the Committee over the objections of Beazer, Hetzer, and TG&C; and (B) whether the term "unsecured creditor," as used in the Settlement Agreement, is limited to the unsecured claims existing as of the time the settlement was reached, or whether it includes all unsecured claims against the estate regardless of when those unsecured claims arose.

**A.     Compensation for Ardent Fox**

Ardent Fox's only fee application in this case requests approval for $133,231.50 in services performed from March 5, 2007 to October 31, 2007, plus expenses of $910.51. In support of its application, Ardent Fox represents that it reduced its customary hourly rates, and further reduced its fees and expenses by 35% as an accommodation to the Committee so that the return to unsecured creditors could be increased. Committee counsel also states that when it agreed to represent the Committee, a substantial risk existed that no estate money would be available to pay the fees of the Committee's professionals.

Beazer and Hetzer object to the fee application on two grounds. First, they contend that the legal issues in the case were not complex, and hourly rates of $320 for an associate with less than five years of experience, and $235 for a paralegal exceeds rates charged by local attorneys. Second, they assert that Ardent Fox spent 80 hours on retention related issues, which, they argue, should be absorbed by Ardent Fox as a cost of doing business. TG&C objects on the basis that it performed accounting services having a value of $3,502, and paying the Committee's counsel in-full while it remains unpaid is impermissibly favoring one priority creditor over another.

Importantly, under the terms of the Settlement Agreement, the funds being used to compensate the Committee's professionals is not estate money; the payment is being made by SFC. Pursuant to Fed. R.

4

Bankr. P. 2016(a), only those seeking compensation for services from the estate are required to file a fee application. Because non-estate funds are being used to pay the Committee's counsel, the court is not required to approve of Ardent Fox's hourly rates or review the services it rendered on behalf of the Committee. *See, e.g.*, *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1313 (1st Cir. 1993) ("The Code does not govern the rights of creditors to transfer or receive nonestate property. . . . [C]reditors are generally free to do whatever they wish with bankruptcy dividends they receive, including to share them with other creditors.").

For example, in *World Health Alternatives, Inc.*, 344 B.R. 291, 297 (Bankr. D. Del. 2006), the United States Trustee objected to a settlement between the unsecured creditor's committee and a secured party whereby the secured party would transfer funds directly to the unsecured creditors without first paying priority debts. The bankruptcy court approved the settlement on the basis that no plan of reorganization was contemplated, and "although the general unsecured creditors will receive money before priority creditors, that money does not belong to the estate . . . ." *Id.*; *see also Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium IP, LLC)*, 478 F.3d 452, 456 (2d Cir. 2007) (indicating that it would approve of a settlement under Fed. R. Bankr. P. 9019 that violated the priority distribution scheme of the Bankruptcy Code – even when the status of the secured creditor's lien was not determined – so long as a justification existed for departing from the Bankruptcy Code's distribution scheme); *cf.*, *In re Armstrong World Indus., Inc.*, 432 F.3d 507 (3d Cir. 2005) (concluding that a settlement proposed within the context of a plan of reorganization had to comply with the absolute priority rule of 11 U.S.C. § 1129(b)(2)).

In this case, the court approved the Settlement Agreement on July 23, 2007; therefore, SFC and the Committee have already obtained the court's permission to pay the $400,000 Unsecured Creditor Allocation outside of the estate, and outside of the requirements of the Bankruptcy Code. Because the Unsecured Creditor Allocation is not being made with estate funds, § 330 is not an applicable standard by which to adjudicate the value of the Committee's services. In the court's view, the amount of compensation allowable to the Committee's counsel is a matter of contract between Ardent Fox and the Committee, and

5

the objections filed by Beazer and Hetzer will be overruled.[2]  Likewise, TG&C has no basis to complain that a private party has agreed to pay the fees of the Committee's professionals.

**B.     "Unsecured Creditors"**

Beazer, Hetzer, and Jefferson Orchards argue that their secured claims are now unsecured due to the lifting of the automatic stay in favor of SFC and SFC II, and SFC II's completion of the foreclosure sale.[3]  The Committee asserts that the term "unsecured creditors," as used in the Settlement Agreement, is limited to those unsecured creditors that existed at the time the Settlement Agreement was executed.  In support of its argument, the Committee contends that the claims of Beazer, Hetzer, and Jefferson Orchards were specifically considered in two separate paragraphs of the Settlement Agreement:

> 9.     **Claims of Objecting Creditors**.  Upon the occurrence of the Lift Stay Event, the claims of the Objecting Creditors, other than the Committee, shall be preserved and enforceable against the Property and SFC to the extent allowable under applicable law.
>
> . . . .
>
> 21.    This Agreement is without prejudice to the claims of Beazer Home Corp., C. William Hetzer, Inc., Jefferson Orchards, Inc., and Centex Homes.

(Document No. 181).

Pursuant to Paragraph 20 of the Settlement Agreement, West Virginia law governs its interpretation.  Under West Virginia law, "contracts containing unambiguous language must be construed according to their plain and natural meaning." *FOP, Lodge No. 69 v. City of Fairmont*, 468 S.E.2d 712, 716 (W. Va. 1996); *see also Cotiga Dev. Co. v. United Fuel Gas Co.*, 128 S.E.2d 626 (W. Va. 1962) ("It is not the right or province of a court to alter, pervert, or destroy the clear meaning of an intent of the

---

[2] In this case there is no evidence of abuse of process or overreaching by the Committee's professionals.  The record in this case was developed in a transparent process that allowed parties in interest the opportunity to object.  Thus, without limiting its prerogative to do so in the future, the court sees no reason in this case to invoke its power under 11 U.S.C. § 105(a) to knuckle down on the fees charged by the Committee's professionals.

[3] Beazer, Hetzer, and Jefferson Orchards may have secured claims that are senior to that foreclosed upon by SFC II.  No determination of the relative priority of the secured claims against the estate are being made in this Memorandum Opinion; rather, to the extent that either Beazer, Hetzer, or Jefferson Orchards has an unsecured claim, the court is determining whether or not those entities are entitled to a share of the $400,000 pool of funds payable to unsecured creditors.

parties as expressed in unambiguous language in their written contract or to make a new or different contract for them.") (Syllabus Pt. 3). Generally, a contract is to be construed as of the date and time on which it was made. *See Lowe v. Guyan Eagle Coals*, 273 S.E.2d 91 (W. Va. 1980) (interpreting a contract as of the time and place of the contract's execution) (Syllabus Pt. 1). Also, contracts should not be fragmented for interpretative purposes; rather, "'where the whole can be read to give significance to each part, that reading is preferred.'" *FOP, Lodge No. 69*, 468 S.E.2d at 718 (citation omitted). Language in "[a] contract is ambiguous when it is *reasonably* susceptible to more than one meaning in light of the surrounding circumstances and after applying the established rules of construction." *Id.* at 716 (emphasis in original). However, the "mere fact that parties do not agree to the construction of a contact does not render it ambiguous." *Berkeley Co. Pub. Ser. Dist. v. Vitro Corp.*, 162 S.E.2d 189 (W. Va. 1968) (Syllabus Pt. 1).

In this regard, the court finds the language in Paragraph 4 of the Settlement Agreement unambiguous: "SFC agrees to allocate . . . $400,000 of the collateral, in cash, to satisfy . . . the claims of unsecured creditors." Outside a bankruptcy context, an "unsecured creditor" is "[a] creditor who, upon giving credit, takes no rights against specific property of the debtor." *Black's Law Dictionary*, 397 (8th ed. 2004). As the term is used in the Bankruptcy Code, however, a creditor that takes rights against specific property may nevertheless be deemed an "unsecured creditor" to the extent that "the value of such creditor's interest" exceeds the estate's interest in the secured property. 11 U.S.C. § 506(a)(1). As such, under the commonly understood meaning of "unsecured creditors" in bankruptcy proceedings, which is the context in which the Settlement Agreement was executed, any creditor holding an unsecured claim – whether it be one that took no rights against specific property, or one that is rendered an unsecured creditor via a property valuation determination – is an "unsecured creditor." The Settlement Agreement does not define "unsecured claims" in a manner that limits the class of unsecured creditors to those in existence at the time the of the execution of the Settlement Agreement, and without such an express limitation, the court will not impose one. Indeed, the court doubts that the Committee would argue that the unsecured claimants existing as of the execution of the Settlement Agreement would still be entitled to a distribution from the Unsecured Creditor Allocation if subsequent events resulted in the withdraw or disallowance of an unsecured creditor's claim.

Moreover, Beazer, Hetzer, and Jefferson Orchards all had filed secured claims against the Debtor's estate based on various deeds of trust that were junior to the lien of SFC, and that were either senior or junior to the lien of SFC II. The valuation of the Debtor's property was an issue in the main bankruptcy and the adversary proceeding. Depending on the outcome of that determination, Beazer, Hetzer, and/or Jefferson Orchards could have fully secured claims, partially secured claims, or wholly unsecured claims. The final determination as to each claimant's classification had not been made as of the time the parties executed the Settlement Agreement. Consequently, from the prospective of those creditors, the Settlement Agreement would have to account for each possibility, which it did. In Paragraph 9, Beazer, Hetzer, and Jefferson Orchards preserved their claims against the property of the Debtor "to the extent allowed by applicable law," and in Paragraph 21, those creditors solidified that the Settlement Agreement did not prejudice their claims against the Debtor's estate. Of course, the Committee had already negotiated the Unsecured Creditor Allocation by haggling a concession from SFC in the event of the lift stay event. It would have been odd for Beazer, Hetzer, and Jefferson Orchards to negotiate their own carve-out agreement with SFC, to the exclusion of existing unsecured creditors, in the event subsequent events transformed their secured claims into unsecured claims. Furthermore, no support exists for the Committee's assertion that it would have negotiated a greater carveout with SFC had it known that Beazer, Hetzer, and Jefferson Orchards were unsecured claimants because there is no indication that SFC would have agreed to such an arrangement.

Therefore, the court does not read into the Settlement Agreement a non-existent definition of "unsecured creditors" that limits the identification of such creditors to those existing as of the time the Settlement Agreement was executed. As written, the contract is unrestricted as to when a claim of an unsecured creditor must be filed, and a plain reading of the Settlement Agreement that is consonant with both the terms of the Agreement as a whole, and with the ordinary understanding of "unsecured creditors" within the context of a bankruptcy proceeding, dictates that Beazer, Hetzer, and Jefferson Orchards are to be included in the Unsecured Creditor Allocation to the extent to which they are unsecured creditors.[4]

---

[4] The court has listened to the recording of the hearing held upon the Settlement Agreement on July 20, 2007. Nothing was spread upon the record at that time that provides the court with any

8

### III. CONCLUSION

For the above-stated reasons, the court will overrule the objections to the fee application of the Committee's professionals, and sustain the objections of Beazer, Hetzer, and Jefferson Orchards to the Committee's motion to approve the distribution of $400,000 to the extent to which those entities have unsecured claims against the estate that are not included in the pool of creditors to be paid the Unsecured Creditor Allocation under the Settlement Agreement. The court will give all creditors 30 days to file amended proofs of claim in this case designating their status as unsecured creditors, will allow an additional 30 days for objections to those proofs of claim to be filed, if any, and will dismiss this case after resolution of any filed objection. The court will enter a separate order pursuant to Fed. R. Bankr. P. 9021.

---

reason to depart from its plain reading interpretation of the Settlement Agreement.